UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OCTAVIAN RISTEA, derivatively on behalf of UiPATH, INC., <br><br> Plaintiff, <br><br> v. <br><br> PHILIPPE BOTTERI, DANIEL DINES, CARL ESCHENBACH, MICHAEL GORDON, ASHIM GUPTA, DANIEL SPRINGER, LAELA STURDY, JENNIFER TEJADA, and RICHARD P. WONG, <br><br> Defendants, <br><br> and <br><br> UiPATH, INC., <br><br> Nominal Defendant. | Case No:_____ <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Octavian Ristea ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant UiPath, Inc. ("UiPath" or the "Company"), submits this Verified Stockholder Derivative Complaint against Defendants and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by UiPath with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by UiPath; (iii) the Securities Class Action captioned *Gera v. UiPath, Inc. et al.,* Case No. 1:23-cv-07908 filed in this District against UiPath and certain officers and members of the Company's Board of Directors (the "Board") alleging that they made false and

misleading statements of material fact and omitted material facts necessary to make other statements made not misleading between April 21, 2021 and March 30, 2022 (the "Relevant Period") with respect to UiPath's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning UiPath.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action asserted on behalf of Nominal Defendant UiPath against certain officers and the members of the Company's Board for the causes of action set forth below. As a direct and proximate result of the misconduct described herein, UiPath has sustained significant damages.

2.     UiPath is a business automation platform that provides artificial intelligence ("AI") and automation technology to its customers. As discussed below, throughout the Relevant Period the Company failed to disclose to investors that (i) UiPath's products had a smaller addressable market than the Individual Defendants (defined herein) portrayed because the relatively high cost of the Company's products limited the use case for many businesses that did not need full robotic process automation ("RPA") software; (ii) UiPath was also losing market share to established enterprise software vendors—such as Microsoft, IBM, and Salesforce—who could bundle their low-code automation products into their enterprise software suites, lessening the need for add-on automation software; (iii) competing low-code automation solutions, such as Power Automate, which could address most of the customer-use cases at a substantially lower price point, further exacerbated UiPath's struggles to generate client demand and maintain robust growth; and (iv) UiPath began to compete with its integration systems partners, which strained these critical relationships and prompted the Company's partners to divert business to UiPath's competitors, particularly Microsoft.

3.      On September 7, 2021, UiPath released its second quarter 2022 financial results, which revealed a slowdown in the Company's revenues and reported annualized renewal run-rate ("ARR"). The Company also revealed that the financial results provided to investors in connection with the Company's initial public offering ("IPO") had been inflated by previously undisclosed discounting and that UiPath was shifting away from discounted multi-year contracts and moving to a "ramping" contact model.

4.      On this news, UiPath's stock price fell $8.06, or 12.9%, to close at $54.40 per share on September 9, 2021, on unusually high trading volume.

5.      On March 30, 2022, UiPath released less-than-expected revenue and ARR guidance for its fiscal year 2023, revealing that the Company expected a continued downhill growth trajectory.

6.      On this news, UiPath's stock price fell $7.45, or 25.7%, to close at $21.59 per share on March 31, 2022.

7.      As alleged herein, the Individual Defendants breached their fiduciary duties and engaged in other misconduct to the Company's detriment and/or aided and abetted the same by engaging in, allowing and/or facilitating the specific misstatements and omissions described herein. As a direct and proximate result of the misconduct described herein by the Individual Defendants, UiPath has sustained significant damages as described below.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a claim for violations of Section 10(b) and 20(a) of the Securities Exchange Act (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state

law claims form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

10.     The Court has personal jurisdiction over all Defendants because they have the requisite minimum contacts with the forum related to the claims asserted and because exercising jurisdiction over Defendants is fair and reasonable. Nominal Defendant UiPath's principal place of business is located in New York, and the other Defendants were officers and directors of UiPath when they committed their actions and omissions giving rise to the claims asserted herein.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to UiPath, occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant UiPath could have sued the same Defendants in this District.

**PARTIES**

12.     Plaintiff is a UiPath stockholder. He has continuously held UiPath stock from the time of the wrongdoing alleged herein until the present. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

13.     Nominal Defendant UiPath is incorporated under the laws of Delaware, and its principal executive offices are located at One Vanderbilt Avenue, 60th Floor, New York, New York

10017. UiPath's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "PATH."

14.    Defendant Philippe Botteri ("Botteri") has served as a member of the Board since February 2020. Before that time, Defendant Botteri served as a Board Observer of the Company from April 2017 to February 2020. Since June 2011, Botteri has served in various senior roles and as a Partner at Accel, the venture capital firm that led the Company to its IPO. Defendant Botteri currently holds directorships and management positions for several Accel entities. According to Form 4s filed with the SEC, Botteri sold directly and/or indirectly, through entities associated with Accel, almost 5.6 million shares of Company stock for proceeds of over $314 million during the Relevant Period:

| Date of Transaction | Number of Shares Sold | Price (USD) | Proceeds |
|---|---|---|---|
| 4/23/21 | 10,046 | $56.00 | $562,576.00 |
| 4/23/21 | 84,457 | $56.00 | $4,729,592.00 |
| 4/23/21 | 3,106,618 | $56.00 | $173,970,608.00 |
| 4/23/21 | 47,321 | $56.00 | $2,649,976.00 |
| 4/23/21 | 300,161 | $56.00 | $16,809,016.00 |
| 4/23/21 | 1,765,783 | $56.00 | $98,883,848.00 |
| 8/16/21 | 163,539 | $60.18 | $9,841,597.13 |
| 8/17/21 | 37,326 | $60.07 | $2,242,038.45 |
| 8/18/21 | 73,784 | $60.27 | $4,447,234.68 |
| **Total** | **5,589,035** | | **$314,136,486.25** |

15.    Defendant Daniel Dines ("Dines") is the Founder of the Company and has served as Chief Executive Officer ("CEO") and as a member of the Board since October 2005. According to Form 4s filed with the SEC, Dines sold directly over 1.4 million shares of Company stock for proceeds of over $80 million during the Relevant Period:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 4/23/21 | 1,383,168 | $56.00 | $77,457,408.00 |
| 11/12/21 | 20,964 | $56.39 | $1,182,094.97 |

| | | | |
|---|---|---|---|
| 11/16/21 | 16,993 | $56.01 | $951,725.25 |
| 11/17/21 | 7,785 | $56.07 | $436,494.05 |
| **Total** | **1,428,910** | | **$80,027,722.27** |

16.     Defendant Carl Eschenbach ("Eschenbach") served as a member of the Board and member of the Audit Committee from March 2021 until his resignation on March 7, 2023. Before that time, Defendant Eschenbach served as a Board Observer from November 2018 to March 2021.

17.     Defendant Michael Gordon ("Gordon") has served as a member of the Board since September 2020 and as Chair of the Audit Committee since at least 2021.

18.     Defendant Ahim Gupta ("Gupta") has served as the Company's Chief Financial Officer since November 2019. Before then, Defendant Gupta served as Chief Customer Success Officer from February 2018 to November 2019. According to Form 4s filed with the SEC, Gupta sold directly and/or indirectly, by the Three Babies 2021 Trust, of which Defendant Gupta is the trustee, over 250,000 shares of Company stock for proceeds of over $13 million during the Relevant Period:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 6/17/2021 | 5,300 | $70.50 | $373,650.00 |
| 6/17/2021 | 13,700 | $70.76 | $969,343.50 |
| 6/28/2021 | 10,000 | $70.38 | $703,843.00 |
| 6/28/2021 | 625 | $70.38 | $43,990.19 |
| 8/24/2021 | 26,404 | $62.00 | $1,637,048.00 |
| 9/9/2021 | 20,000 | $56.10 | $1,122,000.00 |
| 11/4/2021 | 40,000 | $56.48 | $2,259,280.00 |
| 12/10/2021 | 111,250 | $43.74 | $4,865,618.88 |
| 1/3/2022 | 24,546 | $43.26 | $1,061,972.87 |
| **Total** | **251,825** | | **$13,036,746.43** |

19.     Defendant Daniel Springer ("Springer") has served as a member of the Board since April 2021. Defendant Springer has served as a member of the Audit Committee since at least 2021 and as a member of the Compensation Committee since at least 2022.

20.    Defendant Laela Sturdy ("Sturdy") has served as a member of the Board since March 2021. Defendant Sturdy has served as a member of the Compensation Committee from 2021 until April 2023. Before that time, Sturdy served as a Board Observer from November 2018 until March 2021. Since March 2023, Defendant Sturdy has served as Managing Director of CapitalG LP ("CapitalG"). She previously served as General Partner of CapitalG from October 2013 to February 2023. According to a Form 4 filed with the SEC, Defendant Sturdy sold indirectly, through entities associated with CapitalG, over 1.5 million shares of Company stock for total proceeds of over $85.5 million during the Relevant Period:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 4/23/21 | 1,527,673 | $56.00 | $85,549,688.00 |

21.    Defendant Jennifer Tejada ("Tejada") served as a member of the Board from September 2020 until her resignation on April 13, 2023.

22.    Defendant Richard P. Wong ("Wong") has served as a member of the Board since March 2018 and Chair of the Compensation Committee since at least 2021. Since November 2006, Defendant Wong has served as a General Partner at Accel. According to Form 4s filed with the SEC, Defendant Wong sold directly and/or indirectly through entities associate with Accel and by family trust, The Wong Family 2006 Trust, dated 8/30/2006, over 5.5 million shares of Company stock for proceeds of almost $306 million during the Relevant Period:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 4/23/2021 | 3,106,618 | $56.00 | $173,970,608.00 |
| 4/23/2021 | 47,321 | $56.00 | $2,649,976.00 |
| 4/23/2021 | 300,161 | $56.00 | $16,809,016.00 |
| 4/23/2021 | 1,765,783 | $56.00 | $98,883,848.00 |
| 4/23/2021 | 10,046 | $56.00 | $562,576.00 |
| 4/23/2021 | 84,457 | $56.00 | $4,729,592.00 |
| 8/25/2021 | 40,000 | $63.20 | $2,527,952.00 |

| | | | |
|---|---|---|---|
| 2/14/2022 | 75,000 | $37.63 | $2,822,475.00 |
| 2/18/2022 | 75,000 | $37.81 | $2,835,735.00 |
| **Total** | **5,504,386** | | **$305,791,778.00** |

23.     Relevant Non-Party Karenann Terrell ("Terrell") has served as a member of the Board since April 7, 2023 and as member of the Audit Committee since April 2023.

24.     The following Defendants are collectively referenced herein as the "Individual Defendants": Botteri, Dines, Eschenbach, Gordon, Gupta, Springer, Sturdy, Tejada, and Wong.

25.     The following Individual Defendants are collectively referenced herein as the "Director Defendants": Botteri, Dines, Eschenbach, Gordon, Springer, Sturdy, Tejada, and Wong.

26.     The following Individual Defendants are collectively referenced herein as the "Officer Defendants": Dines and Gupta.

27.     The following Individual Defendants are referenced herein as the "Insider Trading Defendants": Botteri, Dines, Gupta, Sturdy, and Wong.

28.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Eschenbach, Gordon, and Springer.

29.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Dines and Gupta.

30.     The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

## **BACKGROUND**

31.     UiPath is a global provider of RPA software. RPA software allows companies to use installed "robots" to execute mundane and menial tasks on behalf of their employees, freeing up those employees to perform more valuable tasks. Among the tasks RPA software can execute

are logging into applications, extracting information from documents, moving folders, filling in forms, and updating information and databases.

32.     UiPath markets its software platform as an "end-to-end" solution that allows its customers to discover novel automation opportunities and build, manage, run, engage, and govern their automation.

33.     The Company purportedly has three revenue segments: (i) licenses, which consist of fees generated from the sale of software licenses, historically offered primarily on annual or multi-year terms; (ii) maintenance and support, which consist of fees generated from technical support services and through the provision of updates and upgrades to UiPath's software, when and if such updates and upgrades become available; and (iii) services and other revenue,[1] which consist of fees generated from process automation, customer education, and training services.

34.     The Company recognizes its license sales revenues at the point in time when a customer can use and benefit from the software, which is generally upon delivery to the customer or commencement of the renewal term. Maintenance and support revenues are recognized ratably over the term of the arrangement, and professional services and other revenues are recognized when the services are rendered.

35.     UiPath generates most of its revenues from the sale of software licenses. In fiscal year 2021, UiPath earned approximately $340 million in license revenue, representing approximately 57% of the Company's total revenues.

36.     UiPath instructs investors to focus on the Company's ARR as an important indicator of the Company's success. The Company has defined ARR as annualized invoice amounts per

---

[1] During the third quarter of its fiscal 2022, UiPath renamed "maintenance and support revenue" as "subscription services revenue" and renamed "services and other revenue" as "professional services and other revenue." UiPath's fiscal year ends on January 31 of the calendar; so, for example, UiPath's fiscal year 2022 ended on January 31, 2022.

solution stock keeping unit (or "SKU") from subscription licenses and maintenance obligations, assuming no increases or reductions in customer subscriptions. ARR does not include costs the Company may incur to obtain such subscription licenses or provide such maintenance and support and does not reflect any actual or anticipated reductions in invoiced value due to contract non-renewals or service cancellations other than for specific reserves, for example, those for credit losses or disputed amounts.

37.    The ARR metric distributes more uniformly the income that UiPath purportedly anticipates generating from a particular contract over an annualized period as compared to ordinary revenue recognition practices that are recognized upon delivery and thus may result in more variability, as is the case with the Company's license sales.

38.    UiPath also reports Net New ARR, which represents incremental growth of ARR during a particular quarter relative to the prior quarter. Each of these operational metrics serves as an important indicator of UiPath's ability to acquire new subscription customers and maintain and expand existing subscription contracts.

39.    To generate sales, UiPath relies, in part, on a direct sales team comprised of three segments: (i) enterprise sales, which focuses on large businesses and public sector organizations; (ii) high velocity inside sales, which focuses on high volume midsized customers; and (iii) global strategic sales, which focuses on the largest strategic accounts.

40.    The Company also relies substantially on external partnerships with systems integrators, regional developers, business process outsourcing providers, and distributors to drive sales in markets where UiPath has a smaller direct sales presence. UiPath's partnership agreements are generally non-exclusive and do not prohibit partners from working with UiPath's competitors or recommending competing products. Outside partnership sales are critical components of

UiPath's overall sales strategy because the Company generates substantial revenues from these channel sales.

41.    Because of the challenges created by the COVID-19 pandemic, demand for automation software, including RPA software, increased in 2020 as businesses sought to mitigate various logistical and financial setbacks created by lockdowns, worker shortages, and remote work mandates. As a result, the automation industry was widely viewed as a rapidly increasing industry. Regardless of these trends, UiPath claimed that it had not received any substantial boost to its overall business from the pandemic.

42.    The large-scale shift towards digitization by enterprise organizations prompted established enterprise software providers, such as Microsoft, IBM, Oracle, and Salesforce, to make inroads into the automation industry.

43.    In May 2020, Microsoft announced its acquisition of Softomotive—a provider of robotic process automation software—to supplement Microsoft Power Automate, Microsoft's existing process automation offering. Although UiPath was generally viewed as the category leader given the robust functionality of its so-called "end-to-end" platform, Microsoft's acquisition of Softomotive expanded Microsoft's "low-code" automation capabilities, allowing Microsoft to offer automation with relatively greater ease of use. In addition, the omnipresence of Microsoft's enterprise software enabled Microsoft, like certain other large-scale office software providers, to bundle its automation software within its broader suite of enterprise software for lower prices.

44.    Throughout the Relevant Period, however, the Individual Defendants failed to disclose to investors that (i) UiPath had enacted a widespread discounting program prior to the IPO, which had the effect of temporarily boosting the Company's revenue and ARR metrics, cannibalizing its future sales, eroding the Company's margins, and increasing the risk of client

churn; (ii) UiPath's "ramping" contract model and the Individual Defendants' directions to investors to focus on the bespoke ARR metric created a materially misleading impression of client demand for the Company's products and its revenue and ARR growth metrics, as the lower initial contract commitment induced certain customers to sign up with the Company who would not pay for larger commitments as the contracts ramped in later time periods; (iii) part of the motivation for UiPath's "ramping" contract model was the Company's inability to sign up customers for longer-term engagements without substantial discounting; (iv) UiPath's actual total addressable market was not as large as portrayed by Defendants because many companies included in the market survey did not need the type of high-cost, high-functionality automation products offered by the Company; (v) UiPath was losing customers to Microsoft, ServiceNow, SAP, Salesforce, IBM, and other established enterprise software vendors that were building automation into their platforms; (vi) UiPath was losing customers due to the increased availability of low-code automation software offered by vendors, such as Microsoft's Power Automate software, which were capable of addressing the majority of customer use cases at a fraction of the price of UiPath's products and services; and (vii) UiPath was suffering from a loss of channel sales due to strained relationships with the Company's partners as a result of increased competition between UiPath and these partners.

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY
## DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

45.     At all times relevant to this case, the Individual Defendants' conduct was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in UiPath.

46.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company

and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

47.    The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

48.    Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and the use and preservation of its property and assets.

49.    Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

50.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of UiPath were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make

accurate statements about the Company's financial results and prospects, and ensure that the Company maintains an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

51.     The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

52.     Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, in addition to the contents of the various public statements issued by UiPath.

53.     The Board has adopted the Company's Global Code of Conduct (the "Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on the Individual Defendants.

54.     The Code of Conduct provides as follows under the heading "Financial Disclosures":

- UiPath is required to maintain accurate financial books and records reflecting the true nature of UiPath's operations and finances. Falsification of company business documents is expressly prohibited. Any employee who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee of the Board, or by raising the concern on the Compliance Hotline.

55.     Under the heading "Disclosure of Insider Information," the Code of Conduct further provides that the use of "confidential information of UiPath or its customers or partners that may provide . . . an unfair financial advantage as it pertains to the purchasing or selling of equity in such companies . . . is unlawful and may lead to civil and/or criminal liability."

56.     The Company also maintains Corporate Governance Guidelines. The Corporate Governance Guidelines state the following, in relevant part, about the responsibilities of the Board:

> A director should discharge his or her duties, including duties as a member of any committee on which he or she serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company and its stockholders. Board members will comply with the laws and requirements of the Exchange and other applicable regulatory agencies and with all policies and guidelines of the Company, including without limitation, the Company's Global Code of Conduct.

> Each director is expected to disclose promptly to the Board and respond promptly and accurately to periodic questionnaires or other inquiries from the Company regarding any existing or proposed relationships with the Company, including compensation and stock ownership, which could affect the independence of the director. Each director will also promptly inform the Board of any material change in such information, to the extent not already known by the Board.

> Board members are expected to devote sufficient time and attention to prepare for, attend, and participate in Board meetings and meetings of committees on which they serve, including advance review of meeting materials that may be circulated prior to each meeting…[.]

57.     In a section titled "Role of the Board of Directors," the Corporate Governance Guidelines state:

> Stockholders select directors to provide oversight and strategic guidance to senior management. A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in the best interests of the Company and its stockholders. Board service requires significant time and attention. More specifically, the Board has responsibilities to review, approve, and monitor fundamental financial and business strategies and significant corporate actions, assess the Company's major risks, and consider ways to address those risks, select and oversee management, and establish and oversee processes to maintain the Company's integrity. To fulfill their duties, directors must prepare for meetings and discussions with management, participate in Board meetings, review relevant materials, and serve on committees. The Company expects directors to maintain an attitude of constructive involvement and oversight, ask relevant and

incisive questions, and demand honest and accurate answers. Directors must act with integrity and demonstrate a commitment to the Company, the Company's values, business, and long-term stockholder value.

58.    UiPath's Corporate Governance Guidelines impose the following duties and responsibilities on the Director Defendants:

> • Directors may not use [the Company's non-public information] confidential information for personal benefit or to benefit other persons or entities other than the Company. Unless authorized by the Company or applicable law, directors will refrain from disclosing confidential information to anyone outside the Company, especially anyone affiliated with any entity or person that employs the director or has sponsored the director's election to the Board. These obligations continue even after service on the Board has ended. The confidentiality obligations described above continue even after service on the Board has ended. Any questions or concerns about potential disclosures should be directed to the Company's General Counsel and Chief Legal Officer, who then may communicate with the Chief Executive Officer(s) or the Nominating Committee regarding the potential disclosures.

## DIRECTOR DEFENDANTS ON PARTICULAR COMMITTEES OWE ADDITIONAL DUTIES

59.    The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Eschenbach, Gordon, and Springer during the Relevant Period.

60.    Pursuant to the Audit Charter, the purpose of the Audit Committee includes the following:

> • overseeing the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements;

> • maintain and foster an open avenue of communication with the Company's management, internal audit group and Auditors;

> • reviewing any reports or disclosures required by applicable law and stock exchange listing requirements;

- overseeing the design, implementation, organization and performance of the Company's internal audit function; and

- helping the Board oversee the Company's legal and regulatory compliance, including risk assessment; and

- provide regular reports and information to the Board.

61.     Pursuant to the Audit Charter, the Audit Committee "will review with management and the Auditors the results of the Company's annual financial statement audit, including:"

- the Auditors' assessment of the quality of the Company's accounting principles and practices;

- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

- all misstatements identified during the audit (other than those the Auditors believe to be trivial); and

- the adequacy of the disclosures in the financial statements.

62.     The Audit Committee "will review and discuss with management and the Auditors any proposed earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies."

**DEFENDANTS BREACH THEIR DUTIES TO THE COMPANY AND ITS STOCKHOLDERS BY MAKING FALSE AND MISLEADING STATEMENTS**

63.     Leading up to the IPO, Defendants claimed that UiPath was experiencing exceptional growth and was competitively positioned to continue these robust growth trends into the future. For example, the IPO documents highlighted UiPath's "rapid growth" and asserted that the Company, which had yet to turn a profit, had "accelerated its path to profitability." The IPO documents represented that the Company had grown its ARR to more than $580 million in the fiscal year ended January 31, 2021, representing 65% year-over-year growth, and its revenues to more than $600 million during this same period, representing 81% year-over-year growth.

64.     On April 21, 2021, Defendants conducted UiPath's IPO, selling over 27.5 million
UiPath shares at $56 per share for over $1.5 billion in gross offering proceeds. Notably, over half
of all shares sold in the IPO were sold by Company insiders, including Defendant Dines who sold
over $77 million worth of UiPath shares in the offering. Even more unusual, Defendants structured
the IPO to grant themselves the ability to dump substantial UiPath shares soon after completion of
the offering, rather than subjecting themselves to the entire 180-day lockup period as is customary.
Certain Individual Defendants continued to sell UiPath shares almost immediately after the partial
lockup period ended. Specifically, Defendant Dines sold nearly $2.6 million worth of UiPath
shares in November 2021 at prices above the IPO price, and UiPath's CFO Defendant Gupta sold
over $13 million worth of UiPath shares between June 2021 and January 2022 at prices as high as
$70.76 per share.

65.     On the day of the IPO, UiPath filed with the SEC a Prospectus on Form 424B4 (the
"Prospectus"). The Prospectus highlighted UiPath's purportedly robust growth rate:

> **_We have experienced rapid growth_**. Our ARR was $351.4 million and $580.4
> million in the fiscal years ended January 31, 2020 and 2021, respectively,
> **_representing a growth rate of 65%_**. We generated revenue of $336.2 million and
> $607.6 million, representing a growth rate of 81%, and a net loss of $519.9 million
> and $92.4 million in the fiscal years ended January 31, 2020 and 2021, respectively.

66.     The Prospectus further discussed UiPath's "hyper growth":

> In fiscal year 2020, we continued to make investments that **_enabled our hyper-
> growth and market capture_**, and began to focus on realizing the operational
> leverage inherent in our business model and customer economics. In fiscal year
> 2021, we continued our focus on demonstrating the operational leverage in our
> business model, **_while prioritizing investments that will allow us to continue to
> achieve best-in-class growth and business scale and to capitalize on our
> significant market opportunity_**.

> We have made incredible progress in building a world-class business. Today, we
> are a company committed to solving for both growth and efficiency and have
> accelerated our path to profitability while continuing to deliver hyper-growth.

67.     The Prospectus also reported UiPath's purported revenue growth:

*Total revenue increased by $271.5 million, or 81%, for the fiscal year ended January 31, 2021 compared to the fiscal year ended January 31, 2020, primarily due to an increase in our licenses revenue of $144.4 million*, an increase in our maintenance and support revenue of $112.9 million and an increase in services and other revenues of $14.2 million. Approximately 75% of the increase in revenue was attributable to growth from existing customers, and the remaining increase in revenue was attributable to new customers. As we continued to expand our sales efforts in the United States and internationally, our increase in total revenue was consistent across all regions.

68.     On June 8, 2021, UiPath issued a release announcing its financial results for the quarter ended April 30, 2021 (the "1Q22 Release"). Therein, the Company stated that UiPath had achieved an ARR of $652.6 million during the quarter, which represented a 64% year-over-year increase, and that UiPath had earned revenues of $186.2 million during the quarter, which represented a 65% year-over-year increase.

69.     In the 1Q22 Release, Defendant Dines attributed UiPath's "*exceptionally strong*" ARR growth to the superiority of UiPath's products and is quoted as stating that the Company's growth was "*a testament to our leadership position in enterprise software automation*."

70.     The 1Q22 Release also quoted Defendant Gupta as stating that "[w]e have experienced rapid growth and now have over 8,500 customers worldwide, including 1,105 customers with ARR of $100,000 or greater and 104 customers with ARR of $1 million or greater."

71.     During the related earnings call, Defendant Dines highlighted UiPath's "record" ARR growth and stated that the Company's "leadership position in the RPA market is again demonstrated by our ARR growth." He continued by stating that "*[w]e continue to grow multiples of the market and take market share*." Likewise, Defendant Gupta noted UiPath's "meaningful growth at scale" and attributed the results to the Company's competitive advantage. Specifically, Gupta stated that "as our results underscore, *we are consistently winning these competitive evaluations. . . .*" He further stated that "the opportunity in front of us is enormous and growing"

and that "*[o]ur strong first quarter results and guidance reflect the growing momentum in our business and the power of our automation flywheel*."

72.    In response to an analyst question regarding his expectations for the rest of the year, Defendant Gupta discussed the purported strength of UiPath's pipeline:

> I just want to start by emphasizing the strength of our quarter $653 million of ARR and a record quarter of incremental ARR breaking $70 million at $72 million total incremental ARR. When you look at that growth, it was really founded on the fact *that we're continuing to add customers at a really fast pace*. So our customer count is now greater than 8,500 customers. That's up more than 600 sequentially, and 2400 year-over-year. Quite frankly, *this has exceeded our expectations.* And we're looking forward as *our pipeline continues to be strong*.

73.    During the call, an analyst asked about the "competitive threat" presented by Microsoft. In response, Defendant Dines downplayed Microsoft as a competitor and assured investors that UiPath was "beat[ing]" out all competition based on its "very differentiated" technology, stating as follows:

> *I would start by saying that we are very differentiated, first of all, in our philosophy towards automation. We have a unique platform that aims to emulate people and their work. Microsoft has built a [low-code/no-code] platform whose main goal is to provide new applications and analytics to the people. They are like comparing apples-to-oranges. Our approach is extremely difficult to replicate. It requires a huge experience curve that we have built over the last 15 years. Our platform is a combination of UI, API and computer vision AI, that is, again, extremely difficult to replicate and it is our secret sauce*.
>
> Moreover, I would say that our differentiations come from the three major directions. First of all, *we have this unique end-to-end horizontal platform that is really necessary to win in this space*. And this is a space that is about the highest return on investment and the fastest time to value that [I've] seen almost ever in the world of enterprise software. We are in a business where we can improve the return of investment. And that was very beneficial throughout our history. We consistently have proven and we have beaten our competitors, with our *technology*. If you go there and if you can show that you are able to implement in half-time, imagine the exponential return on investment that happens when you deploy at scale. And by the way, *we're a technology that is proven to deploy at scale. While I would say that Microsoft's approach has not tested large scale deployments*.

74.     Additionally, Defendant Gupta represented that UiPath's pipeline was "enrich[ed]" by gaining share from its competitors, stating in pertinent part as follows:

> [W]e continue to feel and in the discussions here the TAM $60 million is real, every single industry, every single department, every single process, every single employee, *we see that enrich in really the pipeline of what we look at. So you can see also customers migrating away from our competitors and to us*. And that is not just necessarily just about the strength of our individual components. But that is *the strength of our entire platform*.

75.     On June 9, 2021, UiPath filed its first quarter 2022 financial results on Form 10-Q with the SEC. Defendants Dines and Gupta signed the Form 10-Q, and it contained the same financial information provided in the 1Q22 Release.

76.     On September 7, 2021, UiPath issued a release announcing its second quarter 2022 financial results for the quarter ended July 31, 2021 (the "2Q22 Release"), revealing an unexpected slowdown in UiPath's revenues and reported ARR metrics.

77.     The 2Q22 Release disclosed that UiPath's net new ARR annual growth rate had declined substantially from approximately 55% in the prior quarter to just 33% in the current quarter. The 2Q22 Release also disclosed that growth in UiPath's leading license revenue category had fallen from 57% year-over-year in the prior quarter to just 20% in the current quarter.

78.     The 2Q22 Release also stated that UiPath had achieved ARR of $726.5 million during the quarter, representing a 60% year-over-year increase, and revenues of $195.5 million during the quarter, representing a 40% year-over-year increase.

79.     The 2Q22 Release quoted Defendant Gupta, who attributed UiPath's incremental ARR growth to the Company's "competitive differentiation," stating as follows in relevant part:

> The team executed well this quarter as *we continue to drive meaningful growth at scale*. Our land and expand go-to-market model delivered record net new ARR, *a testament to our competitive differentiation* and the power of our platform to drive meaningful return on investment for our customers. Looking ahead, our priority is to continue to drive growth while exercising operational rigor, *which will allow us to maintain our clear leadership position in this large and growing market*.

80.    During the related earnings call, Defendant Dines highlighted the growth in UiPath's customer base as evidence of the market's "demand for automation," stating in pertinent part as follows:

> As of the end of the second quarter, our customer base was more than 9,100 **_and the number of our customers who are leveraging our platform to accelerate automation is growing quickly_**. We have 1,247 customers that accounted for at least $100,000 in ARR, up 59% from 785 in the second quarter of last year. This includes 118 customers at $1 million plus in ARR, up 100% from 59. **_These numbers demonstrate not only the significant demand for automation, but demand for automation at scale_**.

81.    Defendant Gupta also described UiPath's "market-leading automation platform" as the driver of the Company's "meaningful growth at scale."

82.    In response to an analyst's question, Defendant Dines denied that demand for UiPath's platform was waning as pandemic era impacts receded and stated that "[a]s we are getting, hopefully, in the last phase of COVID, we see solid demand in – for our technology, for our platform" and that "[w]e are seeing quite a solid pipeline for the second part of the year." Defendant Gupta added the following:

> I look at the long-term demand signals that we see. [Defendant Dines] talked about the strength of our pipeline. **_We love our competitive position_**. The awareness in the market around our platform is higher than ever, as you can see from a lot of the industry reports that have also come out. **_So we actually feel very positive about the long-term demand coming out of COVID_**.

83.    In response to an analyst's question regarding the volatility in UiPath's reported net new ARR metrics, Defendant Gupta assured investors that UiPath's pipeline had "grown" and remained "very strong." In relevant part, Gupta stated as follows:

> Look, I look at our incremental ARR numbers, the net new ARR that we've been posting, we're very pleased with it. It reflects the investment. It reflects both the strong dollar base – the impact of the strong dollar-based net retention rate as well as the steady execution of new logos. We continue to invest in our sales force. So as we continue to bring up our sales team and ramp up additional reps, which we've been doing, **_I feel very good about the overall trajectory to fulfill the pipeline that we have in front of us, which has grown and is very strong_**.

84.     During the same call, Defendant Dines represented UiPath's technology as the "winning angle" and denied that the Company was facing competitive pressures. In relevant part, Defendant Dines stated as follows:

> So, we all know this is a big market growing quickly, and automation is the central piece of the digital transformation. So obviously, all major players in the cloud and the business applications are in our space.
>
> *  *  *
>
> So Salesforce is seeing a consolidation between low-code/no-code integration and automation. And this is exactly what we have told the market for a long time, and we have expanded into these areas for a long time. With this big release in the fall, you should expect really a smooth integration of our Cloud Elements acquisition that was done in the beginning of this year. So, we will make a very well-oiled machine around automation with low-code/no-code that we have introduced a year or something ago. And now we're really combining UI automation and API automation in a very good integrated package. ***We believe that our angle towards this consolidated platform is our angle that comes from emulating people is really the one – that is the winning angle.*** All these small acquisitions made me think that still the big software players don't understand how difficult it is to build emulation software. ***This is our bread and butter.*** We have built it for a long time. And starting from this angle, we – ***it gives us a tremendous opportunity to extend our reach to the entire consolidated automation space***.

85.     Defendant Gupta also emphasized the Company's new "ramping" contract structure, asserting that it would lead to "long-term engagement" and boost profit margins:

> ***This structure creates better ROI for our customers, long-term engagement opportunities for our partners and will yield better overall margins for UiPath. It is also positive for ARR growth, which is our most important metric***, but it can create short-term revenue variability due to the timing of license delivery and GAAP revenue recognition.

86.     In response to another analyst's question, Defendant Gupta stated that UiPath's revenue growth would accelerate in later years under the ramping model as additional robots were delivered to customers:

> So what that means is instead of buying simple annual contracts, what we see a larger demand for is getting larger-term commitments from some of our customers. ***But the way they look at that is instead of buying 10,000 robots today, they may***

*buy 1,000 robots today, 5,000 next year, 10,000 in year 3. And those – the license deliveries would happen into those years as we go down*.

\* \* \*

And if there's any confusion on ramp, remember what I mean is you can buy robots of 100 per year for a 3-year deal or you can buy robots of 100, 200, 300 in a deal. *And then the licenses for that additional 100 per year gets delivered in subsequent years, which is why there is – why that creates variability in terms of revenue recognition*.

87.    During the earnings call, Defendant Gupta also revealed that the Company had engaged in substantial discounting of its products before the IPO and that UiPath was in the process of altering the structure of its contracts to include a "ramping" feature whereby customer contract commitments would start small and increase over time and thereby reduce the need for the Company to offer widespread discounting as it had before. In relevant part, Defendant Gupta stated as follows:

Looking at our pipeline, which is strong across geographies, *we see the opportunity to move customers to deal structures with annual ramping, which we expect will lower our overall discounts*.

88.    In response to an analyst's question, Defendant Gupta provided additional information regarding UiPath's shift away from multi-year, discounted deals. In relevant part, Gupta stated as follows:

Billings duration is down and that is because we've deemphasized prepaid deals given our cash position and our gross retention rate. So, when your gross retention rate is 98%, *we don't feel kind of compelled to trade any type of discount for long for getting the cash in the door right today*. We're able to make better and better economic decisions from the position of strength.

89.    Following the September 7, 2021 release and September 8, 2021 earnings call, the Company's stock price fell over $8.00 per share, or over 12% over a two-day trade period to close at $54.40 per share on September 9, 2021, on unusually high trading volume.

90.     On September 8, 2021, UiPath filed its second quarter 2022 financial results on Form 10-Q with the SEC. Defendants Dines and Gupta signed the Form 10-Q, and it contained the same financial information provided in the 2Q22 Release.

91.     On October 14, 2021, Defendants Dines and Gupta represented the Company at the Morgan Stanley Spark Conference. During the conference, Defendant Gupta was asked how the Company derived its $60 billion total addressable market. In response, Defendant Gupta confirmed the purported size of the Company's addressable market and described how it had been verified in multiple ways:

> *So we actually triangulated it multiple ways and independently verified as well. So we've quantified the market at $60 billion-plus*. And we did it very simply. We took our customer base, segmented our companies by the number of employees because that's relatively correlated to complexity and number of processes that are there. We took the top 10% of our customers and said, if every customer in the market could reach these levels of our top 10%, you do that simple math and you get to this number of $60 billion plus in terms of a total available market.
>
> Qualitatively, when you look at it, I live the TAM because I was a customer. So it was the only piece of software, when I was a CFO or a CIO, that could solve problems for legal, HR, finance, supply chain. So it's really relevant to every single department, every single process and every single employee. *When you look at it both qualitative and quantitatively, you can see the massive market that it really is*.

92.     During the conference, an analyst asked about potential concerns that Microsoft may pose a competitive threat. In response, Defendant Dines asserted that "Microsoft doesn't even compete" with UiPath's core unattended robot offerings and posed little overall competitive threat to the Company's business, stating as follows:

> So – and I have high respect for Microsoft, especially under Satya. It's a great company. *And we don't compete really with Power Platform*. Power Platform, it's a big animal. *We compete within – not even with Power Automate, really*. Within this big platform, we compete with a product called Power Automate Desktop, which Microsoft bought 18 months ago from a Greek company. It's a product that was never really proven in large enterprise deployments. It's something that Microsoft sees more like in a personal productivity gain.

So now, if you look at our business, how it is today, we have unattended space, we have attended space. For unattended space, you need a professional tool to – for professional developers. ***This is not – Microsoft doesn't even compete in this space. We've never seen them in a competitive situation for unattended robots. So this is half of our business***.

Now when you speak about attended automation, what this citizen developer tool that Microsoft has competes only for like 1 in 10 of the use cases out there. But what is even more important, when you go head-to-head in terms of products, Microsoft's strategy, at least until now, is to build something that works well within Microsoft ecosystem, like in-app type of automation. Microsoft Power Automate Desktop doesn't work well with SAP, with Salesforce, with ServiceNow. So it works within Microsoft Office technologies.

***But these are very few use cases, low-value use cases. In most of the processes that we are automating, we are seeing like 3 more, 3-plus different types, big categories of applications. So at this point, in reality, I think people are more scared about what Microsoft can do in our space than it's really the reality***.

And there is also something that is very specific about this technology, which is not specific in case of Tableau or in case of Slack. This is an enterprise technology that generates huge return on investment. License pricing, if you use the technology that costs you $5 million a year and you generate $100 million in return on investment a year, would you take a technology that cost you $1 million and will generate only $20 million? I don't think.

***So it's a very – and we can make a very simple return on investment, total cost of ownership, time to value. It's kind of easy because look, when you go to a customer and I – and they go to automation, they have to do something meaningful and measurable. So we have the – use Power Automate, use UiPath, automate this process, put whoever you want to automate and if they see – Microsoft sometimes can struggle 3 weeks to do something we can deliver in 2 hours. We've built this for many years. It's not an easy technology to build. So then the return on investment case, it's so clear***.

93.     Defendant Dines was also asked about competition from enterprise software providers who were adding automation features to their native program suites, and he again dismissed the competitive pressures as insubstantial:

***Servicetrace. At least until this point, we really don't compete with ServiceNow or Salesforce. We simply don't compete with them at this point***. And to me, what they built, it's kind of they sprinkle an RPA term, but buying some kind of cheap companies. And it's mostly used for like in-app automation, which like in the case of Microsoft, this is – this doesn't have too much legs to go over.

*So we – in case of ServiceNow, it's also [an] even more stark[] difference between our go-to-markets. They are primarily an IT shop. We sell primarily to business lines, to CFO, to operations. So I see clearly that it's not conflicting. We are actually customers to each other, we and ServiceNow. So we more partner than compete. We don't compete right now at this point in time.*

94.     On December 8, 2021, UiPath issued a press release announcing its third-quarter financial results for the quarter ended October 31, 2021 (the "3Q22 Release"). Therein, the Company revealed that UiPath's growth had stalled further.

95.     In the 3Q22 Release, the Company disclosed that its ARR annual growth rate during the quarter had declined for the third quarter in a row to 58% and that its net new ARR remained subdued at 42% growth year-over-year, down substantially from the 55% growth reported in the 1Q22 Release.

96.     The 3Q22 Release stated that UiPath had achieved ARR of $818.4 million during the quarter, representing a 58% year-over-year increase, and had earned revenues of $220.8 million during the quarter, representing a 50% year-over-year increase.

97.     The 3Q22 Release also quoted Defendant Gupta as stating that he was "pleased with our third quarter fiscal 2022 results as ARR grew 58 percent and trailing twelve-month revenue grew 57 percent year-over-year, once again demonstrating our market leadership."

98.     During the related earnings call, Defendant Gupta provided additional information regarding the Company's progress on transitioning to non-discounted one-year deals and the related impacts on the quarter:

> And then in terms of the question around duration, billing duration will continue to contract for us. And we've talked about this multiple times in terms of just our focus now with the cash in the bank, that we are going to prioritize, more one-year deals and reduce our dependency on multi-year prepaid deals from a cash flow standpoint, that trend continued in the quarter.

99.     During the same call, Defendant Dines emphasized "considerable demand" for the Company's automation platform:

In summary, we had the strong Q3 and we continue to drive growth at scale. ***The market is very healthy, and we see considerable demand for our automation platform***. I feel very good about what we have been able to accomplish across the business since our IPO and we remain focused on innovation and our customers, which we believe is key to our ongoing success.

100.    During the same call, Defendant Dines also stated as follows:

[W]e are very pleased with what we are seeing in front of us. We are seeing a strong Q4, it's, the demand is there, we are seeing really very engaged partners, so overall, we are very pleased with the direction where our business is going.

101.    Defendant Gupta further noted the alleged strength of UiPath's pipeline, stating in

relevant part as follows:

***The opportunity in front of us is enormous. We have a strong pipeline*** and we feel very good heading into the end of our first fiscal year as a public company. We are building a truly multi-generational company that will change how people experience work. This is what excites us and motivates the team every day. It also keeps our focus on the long-term value creation for our employees, customers, partners, and stockholders.

102.    In response to an analyst's question, Defendant Dines asserted that UiPath

continued to be the "clear leader" among automation providers and that the Company was not

seeing any intensifying competition.

In the last quarter, ***we have not seen any material moves in terms of the competitive landscape***. And I would start by pointing to the first IDC MarketScape report that put us in a very clear leadership position. ***And I would quote them saying that when it comes to real enterprise automation, real scale enterprise automation, customers are choosing UiPath***. And this is, of course, because we offer an end-to-end platform that is suitable from small use cases to the most complex use cases. And indeed, we have this tapestry that we believe it's what helps our customers drive adoption from the process discovery, which is becoming really a driver of growth and helping the adoption to building automation for both professional developers and citizen developers to a strong analytic platform and to our engagement layer, which is basically our low code, no code app platform, which is really dedicated to automation and integration use cases.

So I would, finish my answer, saying that automation is really becoming a critical piece of accelerating digital transformation. ***We are the clear leader, and we continue to win deals in very large scores, because of our technology and our platform***.

103.    When asked specifically about the competitive threat that Microsoft posed, Defendant Dines assured investors that Microsoft had no "***meaningful impact***" on UiPath's "***ability to win customers***," stating as follows:

> In terms of real enterprise traction, ***UiPath is really the only tangible choice for enterprises that want to go from small to complex across different divisions that want a really high level of penetration. Our own data, if we take into account the deals where Microsoft is participating versus the deals where Microsoft is not participating, we are not seeing material changes in our winning rate. So right now, currently, I can say Microsoft has – doesn't have a meaningful impact on our ability to win customers.*** What is going to happen in the next couple of years, first of all, I would like to make a case that Microsoft is focused on citizen developer and personal productivity. This is a small part of our overall TAM. ***So I don't see that in the coming years, Microsoft investment and competing with us will materially derail us from our growth trajectory that we are seeing and we are building right now***.

104.    On this news, the Company's stock price fell over $3 per share, or over 7% over a two-day trading period, to close at $44.05 per share on December 10, 2021, on unusually high trading volume.

105.    On December 10, 2021, UiPath filed its third quarter 2022 financial results on Form 10-Q with the SEC.  Defendants Dines and Gupta signed the Form 10-Q, and it contained the same financial information provided in the 3Q22 Release.

106.    The statements referenced in ¶¶ 63, 65-88, 90-103, and 105 above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that (i) UiPath had enacted a widespread discounting program prior to the IPO, which had the effect of temporarily boosting the Company's revenue and ARR metrics, cannibalizing its future sales, eroding the Company's margins, and increasing the risk of client churn; (ii) UiPath's "ramping" contract model and the Individual Defendants' directions to investors to focus on the bespoke ARR metric created a materially misleading impression of client demand for the

Company's products and its revenue and ARR growth metrics, as the lower initial contract commitment induced certain customers to sign up with the Company who would not pay for larger commitments as the contracts ramped in later time periods; (iii) part of the motivation for UiPath's "ramping" contract model was the Company's inability to sign up customers for longer-term engagements without substantial discounting; (iv) UiPath's actual total addressable market was not as large as portrayed by Defendants because many companies included in the market survey did not need the type of high-cost, high-functionality automation products offered by the Company; (v) UiPath was losing customers to Microsoft, ServiceNow, SAP, Salesforce, IBM, and other established enterprise software vendors that were building automation into their platforms; (vi) UiPath was losing customers due to the increased availability of low-code automation software offered by vendors, such as Microsoft's Power Automate software, which were capable of addressing the majority of customer use cases at a fraction of the price of UiPath's products and services; (vii) UiPath was suffering from a loss of channel sales due to strained relationships with the Company's partners as a result of increased competition between UiPath and these partners; and (viii) as a result, the Individual Defendants' statements during the Relevant Period regarding the Company's business, operations, and key financial metrics such as revenues and ARR were materially false and misleading.

107.    Indeed, unbeknownst to investors, the statements set forth above and similar ones made by the Individual Defendants during the Relevant Period were materially false and misleading when made. UiPath's products had a smaller addressable market than the Individual Defendants portrayed because the relatively high cost of the Company's products limited the use case for many businesses that did not need full RPA software. UiPath was also losing market share to established enterprise software vendors, such as Microsoft, IBM, and Salesforce, who could

bundle their low-code automation products into their enterprise software suites, lessening the need for add-on automation software. In addition, rival low-code automation solutions, such as Power Automate, which could address most of the customer-use cases at a substantially lower price point, further exacerbated UiPath's struggles to generate client demand and maintain robust growth. Compounding the problem, UiPath began to compete with its integration systems partners, which strained these critical relationships and prompted the Company's partners to divert business to UiPath's competitors, particularly Microsoft.

108.    Defendants engaged in a two-part scheme to conceal these adverse demands and competition trends until after they had dumped tens of millions of dollars' worth of UiPath shares at fraud-inflated prices. First, leading up to the IPO, UiPath enacted widespread discounts to artificially boost client demand temporarily. These discounts were unsustainable because of the Company's negative cash flow position, and the discounts had the effect of pulling forward future sales (thereby cannibalizing sales in later periods), eroding margins, and increasing the risk of customer churn upon contract renewal. Second, because this strategy was unsustainable, UiPath switched tactics soon after the IPO, instead offering its customers "ramping" contracts in which they signed up for a relatively modest initial RPA commitment, which would then purportedly grow over time. As relatively lucrative later portions of the contracts' terms were averaged over the initial term pursuant to the method by which UiPath calculated its ARR metric, the Company created a market perception of high ARR growth. However, UiPath risked ultimately not obtaining the purported annualized revenue from these contracts in the event customers canceled their contracts or opted not to renew during the "ramp" phase or otherwise, but nonetheless, that projected revenue was reflected in the ARR figures provided to the market.

109.    Also, throughout the Relevant Period, UiPath's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), also required disclosure of "the material factors that ma[d]e an investment in [UiPath] speculative or risky" and an explanation of "how [the] risk affecte[d] [UiPath]." Defendants' failure to disclose UiPath's discounting program and that UiPath was suffering from worsening demand trends and heightened competitive threats violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Defendants also violated Item 105 because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in UiPath speculative or risky.

110.    Defendants' failure to disclose the truth about UiPath's ramping contract model and the fact that UiPath was suffering from worsening demand trends and heightened competitive threats violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Defendants also violated Item 105 because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in UiPath speculative or risky.

## INSIDER TRADING DEFENDANTS SELL
## COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

111.    During the period of wrongdoing described above, UiPath insiders sold Company stock at artificially inflated prices while in possession of material non-public Company information.

112.    On April 21, 2021, the Company conducted its IPO, selling over 27.5 million shares of Company Class A Common Stock at $56 per share for over $1.5 billion in gross offering proceeds. Most of the shares sold in the IPO were sold by the Insider Trading Defendants and/or entities associated with them.

113.    Company insiders, including Defendant Dines and UiPath's largest equity backers, collectively sold more than $810 million in the IPO. The Individual Defendants also caused UiPath to forgo a customary lockup period, instead enacting a partial lockup, which ultimately enabled the Insider Trading Defendants to collectively dump more than $15 million worth of additional UiPath shares during the Relevant Period.

114.    During the Relevant Period, the Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

- Defendant Botteri sold almost 5.6 million shares of Company stock for proceeds of over $314 million.

- Defendant Dines sold over 1.4 million shares of Company stock for proceeds of over $80 million.

- Defendant Gupta sold over 250,000 shares of Company stock for proceeds of over $13 million.

- Defendant Sturdy sold over 1.5 million shares of Company stock for total proceeds of over $85.5 million.

- Defendant Wong sold over 5.5 million shares of Company stock for proceeds of almost $306 million.

115.    While many of the Company's stockholders lost significant money with the shares dropping substantially, the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by stockholders.

116.    As a result, the Insider Trading Defendants benefited from the artificial inflation of the price of the Company's stock and the resulting increase in the value of UiPath stock and stock options they held.

**THE TRUTH IS REVEALED**

117.    On March 30, 2022, UiPath issued a press release announcing its fourth quarter financial results for the quarter and year ended January 31, 2022 (the "4Q22 Release"). Therein, the Company disclosed that it had earned revenues of just $289.7 million during the quarter, representing year-over-year growth of 39%.

118.    The 4Q22 Release also contained a less-than-expected ARR and revenue guidance. UiPath projected first quarter 2023 ARR in the range of $960 million and $965 million and fiscal 2023 ARR in the range of $1.2 billion and $1.21 billion.

119.    The Company also projected 2023 revenue in the range of $223 million to $225 million and fiscal 2023 revenue in the range of $1.075 billion to $1.085 billion. All these figures were substantially below consensus analysts' expectations and revealed that the declining growth trends impacting UiPath were expected to continue.

120.    On the same day, UiPath filed with the SEC another press release on Form 8-K announcing the abrupt departure of Thomas Hansen, UiPath's Chief Revenue Officer, who was responsible for developing relationships with the Company's current and prospective customers, expanding UiPath's partnership network, and fostering the Company's developer community.

121.    The press release also disclosed that UiPath was hiring Chris Weber, a former Microsoft executive, to serve as the Company's Chief Business Officer, whereby he would be

responsible for leading UiPath's global go-to-market strategy and overseeing the Company's worldwide sales, services, and other go-to-market operations.

122.    During the related earnings call, Defendant Gupta attributed the anticipated slowdown in ARR growth to macroeconomic issues, the emerging war in Ukraine, disruptions caused by the transition in sales leadership, and uncertainty surrounding large deals. However, the magnitude of the guidance reduction belied these representations, which could not reasonably account for the full extent of the slowdown in the Company's anticipated ARR and revenue growth metrics.

123.    On this news, the price of UiPath common stock fell $7.45 per share, or more than 25%, to close at $21.59 per share on March 31, 2022, on above-average trading volume.

124.    In subsequent written reports, several analysts covering the Company described the ARR and revenue outlook as "disappointing." For example, a report issued by BMO Capital Markets stated that it was "surprised by the magnitude of the guidance change" and noted that even normalizing for the Ukraine war and macroeconomic issues, the newly issued guidance "suggests ARR growth is expected to decelerate to ~35% y/y."

125.    Analysts at Summit Insights Group similarly observed, based on their own independent channel checks and conversations with industry participants, that UiPath was losing market share to competitors offering lower-cost alternatives and established enterprise software providers who could bundle automation software into their native products and, further, that UiPath's relationships with its partners had become strained causing these partners to shift their focus to Microsoft products. Summit also concluded that many customers and potential customers of UiPath were forgoing the Company's products because of their substantially higher price points

as compared to rival offerings, specifically noting that Microsoft's Power Automate provided 80% of the functionality of UiPath's products at less than half the price.

126.    Confirming the Individual Defendants' scheme to boost UiPath sales in the short term to allow them to dump tens of millions of dollars' worth of UiPath stock in October of 2022—approximately one year after UiPath had revealed that it was suspending its discount program—analysts at Evercore reported that customers up for renewal were monitoring their spending at UiPath because the Company had "'remov[ed] many of the discounts that these customers had received initially.'"

127.    By the first quarter of fiscal 2023, UiPath's net new ARR would decline by more than 50%, sequentially, to just $51.8 million. UiPath's revenue growth rate slowed every quarter from the third fiscal quarter of 2022 to the fourth fiscal quarter of 2023, bottoming out at just 7% year-over-year growth in the fourth fiscal quarter of 2023, belying Defendants' representations that the Company's new contracts issued during the Relevant Period would "ramp" in later years, thereby leading to accelerating revenue increases. Similarly, UiPath's AAR growth rate declined every quarter from the fourth fiscal quarter of 2022 to the first fiscal quarter of 2024, dropping to just 28% year-over-year growth by the first fiscal quarter of 2024.

128.    Notably, it was not until after UiPath hired Co-CEO, Robert Enslin ("Enslin"), that the Company admitted during a conference call that Microsoft's competitive offerings were having a substantial impact on Uipath's ability to effectively market its product offerings to clients. During a September 7, 2022 investor conference call Enslin stated that Microsoft "certainly does have an impact on how we sell and how we position ourselves in certain companies," further admitting that "that's also the reason why we have to position the platform and get the branding right for the platform."

**UiPATH REPURCHASES SHARES DURING THE RELEVANT PERIOD**

127.    During the Relevant Period, the Individual Defendants caused the Company to repurchase its common stock at artificially inflated prices. In total, during the Relevant Period, the Company spent over $10.5 million to repurchase 185,932 shares at artificially inflated prices. The actual value of the Company's stock was $21.59 per share, as of closing on March 30, 2021, therefore, UiPath should have spent around $4 million to repurchase its stock during the Relevant Period. As a result of the overpayment, UiPath suffered damages in an amount over $6.55 million.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT
DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO UIPATH**

129.    As a result of the Individual Defendants' misconduct, UiPath disseminated improper public statements concerning UiPath's operations, prospects, and internal controls. This misconduct has devastated UiPath's credibility.

130.    As a direct and proximate result of the Individual Defendants' actions, UiPath has expended and will continue to expend significant sums of money defending and paying any judgment or settlement in the Securities Class Action.

131.    As a direct and proximate result of the Individual Defendants' actions as alleged above, UiPath's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

132.    The actions of the Individual Defendants have also irreparably damaged UiPath's corporate image and goodwill. For the foreseeable future, UiPath will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that UiPath's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

133.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued or joined in the pursuit of a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

134.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

135.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

136.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or

substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

137.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and UiPath and was at all times acting within the course and scope of such agency.

**PLAINTIFF HAS BEEN A STOCKHOLDER SINCE THE
ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY
REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS**

138.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

139.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

140.    Plaintiff is the owner of UiPath common stock and has been an owner of UiPath common stock since the wrongdoing alleged herein.

141.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

**DEMAND IS FUTILE BECAUSE EACH DIRECTOR DEFENDANT
FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY**

142.    At the time Plaintiff commenced this action, the Board consisted of nine directors, including Director Defendants Botteri, Dines, Eschenbach, Gordon, Springer, Sturdy, Tejada, and Wong, and Relevant Non-Party Terrell. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

143.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the

Company's SEC filings, press releases, and other public statements and presentations concerning UiPath's business, operations, prospects, internal controls, and financial statements.

144.    Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust, effective, and implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

145.    Here, the Director Defendants failed to implement internal controls that would identify critical information regarding the ineffectiveness of the Company's contract model and the detrimental effects growing competition had on UiPath's finances. This fact is shown by, among other things, the fact that there was no board-level committee charged with evaluating and managing risks to the Company and that there was no system for ensuring that mission-critical information was provided directly to the Board rather than being siphoned through the Company's management.

146.    The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute

breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

147.    In addition, the Director Defendants caused the Company to repurchase over 185,000 shares of UiPath common stock at artificially inflated prices during the Relevant Period.

148.    If Director Defendants were to bring a suit on behalf of UiPath to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, Plaintiff's making a demand would be futile.

149.    The Audit Committee Defendants (Eschenbach, Gordon, and Springer), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements. More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter. For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

150.    Because of their positions as officers and/or board members, Individual Defendants Botteri, Dines, Sturdy, and Wong possessed material non-public information, unlawfully misused this information, and unjustly enriched themselves at the Company's expense by selling their shares at artificially inflated prices. Individual Defendants Botteri, Dines, Sturdy, and Wong each face a substantial likelihood of liability for insider selling as well as for their breaches of fiduciary

duty to the Company and are, thus, incapable of considering a demand to commence and vigorously prosecute this action.

151.    In addition, Defendant Dines is not independent because his principal occupation is CEO of UiPath, and he serves as Chair of the Board. Additionally, Defendant Dines was the founder and CEO of UiPath's predecessor entity.

152.    The Company paid Defendant Dines a salary of $104,044 and $110,032 as other compensation for a total of $216,076 for UiPath's fiscal year 2021, a salary of $6,017 and $663,629 as other compensation for a total of $669,646 for its fiscal year 2022, and a salary of $6,017 and $765,818 as other compensation for a total of $771,835 for the Company's fiscal year 2023. These amounts are material to Defendant Dines, and therefore, he would not be able to impartially consider a demand against the Director Defendants who approve his executive compensation, particularly the members of the Compensation Committee.

153.    In connection with the IPO, Dines sold 1,383,168 shares of Class A Common Stock with estimated proceeds of over $77 million. As of April 18, 2023, Defendant Dines holds a voting power of almost 87%. Thus, Defendant Dines is also incapable of considering a demand to prosecute this action because he is not disinterested.

154.    Defendant Dines also faces an additional substantial likelihood of liability because he is a named defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated under the Exchange Act. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Dines' willful and/or reckless violations of his obligations as a director of UiPath. Hence, Defendant Dines is incapable of considering a demand to commence and

vigorously prosecute this action because he faces an even greater likelihood of personal liability than the rest of the Director Defendants.

155.    Defendants Botteri and Wong have a longstanding personal and business relationship and cannot exercise independent business judgment in considering a demand. Since June 2011, Defendant Botteri has served in various senior roles and as a Partner at Accel and currently holds directorships and management positions for several Accel entities and other private companies. Since November 2006, Defendant Wong has served as a General Partner at Accel. Defendants Botteri and Wong have known each other since at least 2011 and have a long-standing business and personal relationship.

156.    In connection with the IPO, the entities associated with Accel[2] sold 5,314,386 shares of the Company's Class A Common Stock at around $56 per share for total profits of almost

---

[2] Accel's holdings consist of (a) 624,114 shares of Class A common stock held by Accel Growth Fund Investors 2016 L.L.C., (b) 13,048,188 shares of Class A common stock held by Accel Growth Fund IV L.P., (c) 74,245 shares of Class A common stock held by Accel Growth Fund IV Strategic Partners L.P., (d) 328,862 shares of Class A common stock held by Accel Leaders Fund Investors 2016 L.L.C., (e) 6,883,068 shares of Class A common stock held by Accel Leaders Fund L.P., (f) 3,381,687 shares of Class A common stock held by Accel London Investors 2016 L.P., (g) 34,999,995 shares of Class A common stock held by Accel London V L.P., and (h) 533,128 shares of Class A common stock held by Accel London V Strategic Partners L.P. Accel Leaders Fund Associates L.L.C., the general partner of Accel Leaders Fund L.P., may be deemed to have sole power to vote and sole power to dispose of the shares of Class A common stock directly owned by Accel Leaders Fund L.P., Accel Growth Fund IV Associates L.L.C., the general partner of Accel Growth Fund IV L.P. and Accel Growth Fund IV Strategic Partners L.P., may be deemed to have sole power to vote and sole power to dispose of the shares of Class A common stock directly owned by Accel Growth Fund IV L.P. and Accel Growth Fund IV Strategic Partners L.P. Defendant Wong, a member of the Board and a managing member of Accel Leaders Fund Associates L.L.C., Accel Leaders Fund Investors 2016 L.L.C., Accel Growth Fund IV Associates L.L.C., and Accel Growth Fund Investors 2016 L.L.C., may be deemed to have shared power to vote and shared power to dispose of these shares. Accel London V Associates L.P., the general partner of Accel London V L.P. and Accel London V Strategic Partners L.P., may be deemed to have sole power to vote and sole power to dispose of the shares of Class A common stock directly owned by Accel London V L.P. and Accel London V Strategic Partners L.P. Accel London V Associates L.L.C., the general partner of Accel London V Associates L.P. and Accel London Investors 2016 L.P., may be deemed to have sole power to vote and sole power to dispose of these shares, and Defendant Botteri, a

$300 million. Defendants Botteri and Wong have pecuniary interests in, and are managing members of Accel, the venture capital firm that led UiPath to its IPO. Accordingly, Defendants Botteri and Wong cannot exercise independent business judgment in considering a demand to investigate and vigorously prosecute this action because it would require each of them to sue the Company and the members of the Board, including each other.

**FIRST CAUSE OF ACTION**
**Against the Individual Defendants for Breach of Fiduciary Duties**

157.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

158.   Each Individual Defendant owed the Company the duty to exercise candor, good faith, and loyalty in the management and administration of UiPath's business and affairs.

159.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

160.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of UiPath.

161.   In breach of their fiduciary duties owed to UiPath, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, (a) that the Company's "ramping" contract model and Defendants' directions to investors to focus on the bespoke ARR metric created a materially misleading impression of client demand for the Company's products

---

member the Board and a managing member of Accel London V Associates L.L.C., may be deemed to have shared power to dispose of these shares.

and its revenue and ARR growth metrics, as the lower initial contract commitment induced certain customers to sign up with the Company who would not pay for larger commitments as the contracts ramped in later time periods; (b) that part of the motivation for UiPath's "ramping" contract model was the Company's inability to sign up customers for longer-term engagements without substantial discounting; (c) that UiPath's actual total addressable market was not as large as portrayed by Defendants, because many companies included in the market survey did not need the type of high-cost, high-functionality automation products offered by the Company; (d) that UiPath was losing customers to Microsoft, ServiceNow, SAP, Salesforce, IBM, and other established enterprise software vendors that were building automation into their platforms; (e) that UiPath was losing customers due to the increased availability of low-code automation software offered by vendors, such as Microsoft's Power Automate software, which were capable of addressing the majority of customer use cases at a fraction of the price of UiPath's products and services; (f) that UiPath was suffering from a loss of channel sales due to strained relationships with the Company's partners as a result of increased competition between UiPath and these partners; and (g) that, as a result, Defendants' positive statements regarding the Company's business, operations, and key financial metrics such as revenues and ARR were materially false and misleading, and lacked a reasonable basis.

162.    Accordingly, UiPath's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

163.    The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of

material fact referenced herein, thereby rendering themselves personally liable to the Company for breaching their fiduciary duties.

164.    The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

165.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

166.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

167.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

168.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, UiPath has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against the Securities Class Action Defendants for**
**<u>Violations of Sections 10(b) of the Exchange Act and Rule 10b-5</u>**

169.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

170.     The Individual Defendants are liable to the Company because they violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

171.     The Individual Defendants did the following while acting individually and collectively:

(a)     employed devises, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material factsnnecessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of UiPath common stock during the Relevant Period.

172.     As set forth above, the Individual Defendants disseminated or approved the dissemination of material false and misleading statements while also failing to disclose material facts necessary to make the statements made not misleading under the circumstances.

173.     The Individual Defendants knew or recklessly disregarded facts showing that these statements were false and misleading because they received or had access to such information.

174.    As a result of the Individual Defendants' making these materially false and misleading statements or permitting them to be made, UiPath's common stock traded at artificially inflated prices during the Relevant Period.

175.    As discussed above, the Company spent $10.5 million purchasing 185,932 shares of UiPath common stock at artificially inflated prices during the Relevant Period when it should have spent around $4 million for that number of shares.

176.    Accordingly, the Company has suffered damages because it paid artificially inflated prices for UiPath common stock.

### THIRD CAUSE OF ACTION
### Against the Securities Class Action Defendants for Contribution
### Under Sections 10(b), 20(a), and 21D of the Exchange Act and Rule 10b-5

177.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

178.    UiPath, along with the Securities Class Action Defendants (Dimes and Gupta), are named as Defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. If the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or director of UiPath.

179.    Because of their positions of control and authority as officers and/or director of UiPath, the Securities Class Action Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of UiPath, including the wrongful acts complained of herein and in the Securities Class Actions.

180.    Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

181.    As such, UiPath is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

**FOURTH CAUSE OF ACTION**
**<ins>Against the Individual Defendants for Unjust Enrichment</ins>**

182.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, UiPath.

184.    The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from UiPath that was tied to the performance or artificially inflated valuation of UiPath, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

185.    Plaintiff, as a stockholder and representative of UiPath, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

186.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

### FIFTH CAUSE OF ACTION
### Against the Individual Defendants for Waste of Corporate Assets

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

189.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

190.    Plaintiff, on behalf of UiPath, has no adequate remedy at law.

### SIXTH CAUSE OF ACTION
### Against all the Individual Defendants for Aiding and Abetting

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Defendants are in breach of their fiduciary duties to UiPath and has participated in a conspiracy in breach of fiduciary duties.

193.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

194.    The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

195.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

196.    Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

197.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

### SEVENTH CAUSE OF ACTION
### Against the Insider Trading Defendants for
### <u>Insider Selling and Misappropriation of Information</u>

198.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199.    The Insider Trading Defendants (Botteri, Dines, Gupta, Sturdy, and Wong) stood in a confidential relationship with UiPath and owed UiPath duties of loyalty, good faith, and care as officers, directors, and/or controlling stockholders.

200.    At the time of their stock sales set forth herein, the Insider Trading Defendants (Botteri, Dines, Gupta, Sturdy, and Wong) knew of the information described above and sold UiPath common stock on the basis of such information.

201.    The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold UiPath common stock.

202.    The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

203.    Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

### EIGHTH CAUSE OF ACTION
**Against the Securities Class Action Defendants for Contribution
and Indemnification Against the Securities Class Action Defendants**

204.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

205.    The Securities Class Action Defendants, as alleged in the Securities Class Action as set forth above, caused the Company to issue false and misleading statements and omit material information as discussed above.

206.    That misconduct as described above gives rise to the Company's alleged liability in the Securities Class Action, and thereby, the Securities Class Action Defendants have directly and proximately caused substantial injury to UiPath.

207.    Therefore, on behalf of the Company, Plaintiff seeks damages from the Securities Class Action Defendants for contribution and/or indemnification.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of UiPath and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.     Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sales of UiPath stock while in possession of insider information as described herein;

D.     Awarding prejudgment interest to the Company;

E.     Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

F.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  January 9, 2024                                    Respectfully submitted,

                                                           BRAGAR EAGEL & SQUIRE, P.C.

                                                           _/s/ J. Brandon Walker_
                                                           J. Brandon Walker (Bar No. JW0506)
                                                           Lawrence P. Eagel (Bar No. LE4505)
                                                           Gabriela Cardé Cortés (*pro hac vice to be submitted*)
                                                           810 Seventh Avenue, Suite 620
                                                           New York, New York 10019
                                                           Telephone: 212-308-5858
                                                           Email:  walker@bespc.com
                                                                   eagel@bespc.com
                                                                   carde@bespc.com

Badge Humphries (*pro hac vice to be submitted*)
2113 Middle Street, Suite 305
Sullivan's Island, South Carolina 29482
Telephone: 843-883-7444
Email: humphries@bespc.com

*Counsel for Plaintiff Octavian Ristea*

**VERIFICATION**

I, Octavian Ristea, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of UiPath, Inc common stock at all relevant times.

Executed this 3 day of January, 2024.

Octavian Ristea (Jan 3, 2024 14:08 EST)

Octavian Ristea